115 F.3d 1442
 47 Fed. R. Evid. Serv. 238, 97 CJ C.A.R. 915
 Ronald K. MASON, Plaintiff-Appellee-Cross-Appellant,
v.
OKLAHOMA TURNPIKE AUTHORITY, Sam Scott, and Terry Young,
Defendants-Appellants-Cross-Appellees,
and
James Orbison, Gilbert Gibson, Mick LaFevers, Jim Scott,
John Gibbs, James Beach, and Alan Freeman, Defendants.
 Nos. 96-6065, 96-6069.
 United States Court of Appeals,
Tenth Circuit.
 June 11, 1997.
 
 Graydon Dean Luthey, Jr. (Michael T. Keester with him on the briefs), Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Tulsa, OK, for Defendants-Appellants/Cross-Appellees Oklahoma Turnpike Authority, Sam Scott, and Terry Young.
 Jan Preece Gaddis, Duncan, Oklahoma, and Joseph Righton Weeks, Oklahoma City, OK, for Plaintiff-Appellee/Cross-Appellant Ronald K. Mason.
 Before ANDERSON, BALDOCK, and EBEL, Circuit Judges.
 STEPHEN H. ANDERSON, Circuit Judge.
 
 
 1
 Following his discharge on March 22, 1993, from the Oklahoma Turnpike Authority ("OTA"), Plaintiff Ronald Mason filed suit against the OTA, the OTA's Managing Director Terry Young, Young's principal assistant James Beach, all six OTA members (John Gibbs, Gilbert Gibson, Mick LaFevers, James Orbison, James Scott, and Sam Scott), the OTA's Director of Human Resources Alan Freeman, the OTA's outside general counsel Thomas Hilborne, and the Oklahoma Secretary of Transportation Delmas Ford. Mason alleged, pursuant to 42 U.S.C. § 1983, that his discharge violated his constitutional rights to free speech, free association, and due process. As pendent state law claims, Mason also alleged breach of contract, promissory estoppel, wrongful discharge in violation of public policy, fraud, tortious interference with employment contract, and violation of an Oklahoma worker's hiring statute.
 
 
 2
 Pre-trial proceedings eliminated most of Mason's claims. By first amended complaint, Mason dropped his free speech claim. He voluntarily dismissed Delmas Ford and Thomas Hilborne with prejudice. Upon the defendants' motion, the district court then granted summary judgment dismissing an additional seven defendants and several of Mason's claims. Thus, at the time of trial, only three claims and three defendants remained: (1) a section 1983 political patronage (free association) claim against the OTA, Sam Scott, and Terry Young; (2) a wrongful discharge in violation of public policy claim against the OTA, Sam Scott, and Terry Young; and (3) a tortious interference claim against Sam Scott.
 
 
 3
 Following trial, the jury found for Mason on all claims, awarding him compensatory and punitive damages. The district court denied the defendants' post-trial motions for judgment as a matter of law and a new trial, but altered the judgment to eliminate duplication in the punitive damage awards. The district court also denied Mason's motion for a new trial on the issue of compensatory damages. On appeal, the defendants[1] seek reversal of the jury verdict or at least a further reduction in the punitive damage awards. On cross-appeal, Mason seeks a new trial on the issue of compensatory damages, as well as reversal of the district court's alterations to the punitive damage awards. We affirm in part, reverse in part, and stay Mason's cross-appeal in part.
 
 BACKGROUND
 
 4
 The OTA is an instrumentality of the state of Oklahoma responsible for constructing and operating the State's turnpike system. The OTA is directed by six Authority members who are appointed by the Governor from separate geographical districts and confirmed by the state senate. These members serve at the Governor's pleasure and are not compensated. The Governor is an ex-officio Authority member. During the periods relevant to this litigation, David Walters was the Democratic Governor of Oklahoma, and Defendant Sam Scott was an OTA member appointed by Governor Walters.
 
 
 5
 Operating the turnpikes requires a considerable workforce. Most OTA employees serve in "classified," terminable-for-cause positions which, pursuant to Oklahoma's civil service law, may be filled only after advertisement and a competitive application process. Some positions within the OTA, however, are exempt from the civil service laws. Exempt positions may be filled without advertisement or examination, and exempt employees may be terminated at will. For instance, the OTA's highest-ranking executive, the Managing Director, is exempt and terminable at will. The Managing Director's principal assistant also is an exempt employee. The Governor may create an additional exempt position ad hoc by issuing what is known as a "Governor's letter."
 
 
 6
 In 1988, the OTA members hired Richard Ridings as Managing Director.[2] Upon assuming his office, Ridings obtained the resignation of the previous Managing Director's principal assistant, and offered the position to Plaintiff Mason. Ridings knew Mason because they had worked together in Oklahoma City government, where Mason had served as the City's finance director. Ridings wanted Mason to work at the OTA because Ridings believed Mason's financial expertise would prove valuable to the OTA as it prepared to undertake a major bond issue. Ridings changed the title of principal assistant to Chief Financial Officer, and Mason accepted the position on April 18, 1990. It is undisputed that Mason always performed satisfactory, if not excellent, work at the OTA, and that his employment record is free of any misconduct.
 
 
 7
 At trial, the parties sharply disputed the motivation behind Mason's eventual discharge. Mason, a political independent, contended he was discharged for at least three reasons: first, to make room for the political patronage hiring of his successor, James Beach; second, in retaliation for his opposition to the proposed illegal hiring of James Beach; and third, in retaliation for his opposition to the proposed illegal construction of the Coweta Toll Plaza from surplus OTA funds. Defendants strenuously denied any such motivations, testifying instead that Mason's discharge resulted solely from Terry Young's independent decision to reorganize the OTA upon his appointment as Managing Director. In order to provide context for the issues raised on appeal, we briefly summarize the parties' competing versions of events.
 
 A. Mason's Version of Events
 
 8
 At trial, Mason elicited testimony which, if believed, established the following facts. Late in Richard Ridings' term as Managing Director, OTA member Sam Scott began pressuring Ridings to find work at the OTA for James Beach, a long-time, active Democratic supporter who was experiencing health problems and badly needed both a job and health benefits. App. Vol. III at 728.9. Governor Walters' chief of staff, Jerry Goodman, also pressured Ridings to hire Beach. Id. at 843. Succumbing to this pressure, Ridings asked Mason to interview Beach and hire him on a temporary contract. Ridings described Sam Scott to Mason as an "old-guard type politician" who believed in political patronage hiring. Id. at 728.10. Although Mason did not consider Beach particularly qualified for any available position at the OTA, Ridings told Mason to hire Beach on a temporary contract because they "needed to keep in good standing with the Democrats who were in the administration at that point." Id.
 
 
 9
 As Beach's temporary contract neared expiration, Scott pulled Mason into an office and asked if Mason had found a way to permanently employ Beach. Mason expressed his opinion to Scott that the OTA could not lawfully hire Beach to a permanent position because all the exempt positions were filled and Beach had not satisfied the requirements for hiring under the civil service system. Scott replied, "Horse manure. I don't care what the problem is, I want you to hire Mr. Beach or he'll have your job one of these days." Id. at 729-30. Not long after this conversation, Ridings received instructions from OTA member James Orbison to hire Beach as an independent contractor to work in the area of patron services and community relations. Beach received such a contract, even though Ridings considered it political patronage and a waste of OTA resources. Beach's status as an independent contractor, however, was still temporary and did not entitle him to health benefits.
 
 
 10
 In December 1992, Ridings left the OTA to enter private business. On February 6, 1993, Beach attended a fund-raising dinner for Governor Walters. Beach personally gave Jerry Goodman a $1000 campaign contribution for the Governor. Also in February 1993, Governor Walters and Goodman interviewed Terry Young for the Managing Director position left vacant by Ridings. Young is a prominent Oklahoma Democrat who has served as Mayor of the City of Tulsa, as a Tulsa County Commissioner, and as a member of both the Democratic National Committee and the Executive Committee of the Democratic Party of Oklahoma. App. Vol. VI at 1687-88. After Young's interview, the OTA members were informed that Young was the Governor's choice for Managing Director, and they appointed Young to that position on February 19, 1993.
 
 
 11
 On March 13, 1993, Mason discussed with Young a proposed plan to construct a new Coweta Toll Plaza in Scott's district. As initially conceived, the toll plaza project would be financed with surplus funds from other projects. Mason informed Young that the OTA could not lawfully commit surplus funds to the Coweta Toll Plaza until previously-committed projects were declared complete in accordance with the trust agreement. Furthermore, Mason doubted that any surplus funds actually would be available after proper accounting. Young responded that Scott would be very displeased to hear Mason's opinion because Scott strongly desired to have the project completed. App. Vol. III at 741.
 
 
 12
 On March 16, 1993, Scott discussed Mason's opinion with Jim Berry, an OTA engineer. According to Berry, Scott was "extremely upset" about Mason's opposition, and he wanted Berry to "go talk to [Mason] and straighten him out." App. Vol. IV at 892. Scott told Berry that if Mason would not withdraw his opposition, then Scott would "see if we couldn't get a new chief financial officer." Id.
 
 
 13
 After talking to Berry, Scott contacted Mason directly. Mason again explained his opinion that the Coweta Toll Plaza could not be financed with surplus funds. Scott replied, "I'll make no bones about it; you're obstructing this project, and if you continue to obstruct this project, I'll have your job." Appellant' App. Vol. III at 743. Mason did not change his position.
 
 
 14
 Three days later, on March 19, 1993, Young met with Scott, who then served as Chairman of the OTA's personnel committee. App. Vol. V at 1248. Although Mason could not present any evidence of what occurred during this meeting, the first written record of a plan to discharge Mason was completed on that day. App. Vol. VI at 1613. On March 22, Young terminated Mason without notice, telling Mason that the personnel committee had approved the discharge. App. Vol. III at 754-55. After Mason's discharge, Young changed the title of Chief Financial Officer back to principal assistant. Young then hired James Beach as principal assistant on April 1, 1993, even though Young had never interviewed Beach, had not received any formal evaluations of his previous work at the OTA, and had met Beach only briefly eight years earlier. App. Vol. V at 1276-77. Young transferred Mason's previous financial duties to other OTA employees, and assigned Beach the primary responsibility of public and patron relations.
 
 B. Defendants' Version of Events
 
 15
 The defendants tell a starkly different story. At trial, Sam Scott denied ever telling Mason to hire Beach or to withdraw his opposition to the Coweta Toll Plaza. Scott denied ever threatening to have Mason terminated for any reason. Both Scott and Young testified they were never pressured by anyone from the Governor's office to hire Beach, and they denied any knowledge of Beach's status as a financial contributor to the Governor. Furthermore, Scott testified that he never played any part in Young's decision to terminate Mason, and never expressed any opinion to Young on the matter.
 
 
 16
 Instead, Young testified that he independently decided to terminate Mason and hire Beach prior to assuming his duties at the OTA. In Young's opinion, the OTA no longer needed a Chief Financial Officer as principal assistant because the OTA was no longer confronted with the bond and finance issues that originally prompted Ridings to hire Mason. Young believed the OTA Comptroller and other employees could adequately perform Mason's previous duties, and Young wanted to hire a previous colleague to the Comptroller position. Id. at 1226-29. Thus, according to Young, he hired Beach to take advantage of Beach's experience in patron services and community relations, experience Young felt the OTA sorely needed at that juncture. Id. at 1232-33.
 
 C. The Verdict and Judgment
 
 17
 After a four-day trial, the district court denied the defendants' motion for judgment as a matter of law and submitted the case to the jury. The jury found for Mason on all claims and awarded him $185,572.70 in compensatory damages. The jury also awarded punitive damages as follows: $150,000 against Young and $150,000 against Scott on the section 1983 claim; $150,000 against Young and $250,000 against Scott on the wrongful discharge claim; and $300,000 against Scott on the tortious interference claim.[3] The issue of front pay was then tried to the court, and the court awarded Mason $60,000.
 
 
 18
 The defendants filed post-trial motions for judgment as a matter of law, a new trial, remittitur, and to alter and amend the judgment. The district court denied judgment as a matter of law and declined to grant a new trial, but altered the judgment in two ways. First, pursuant to Title 23 Okla. Stat. § 9, the district court determined that the punitive damages awarded against each defendant on the state law claims could not exceed the total value of compensatory damages. App. Vol. VI at 1562-63 (Mason v. Oklahoma Turnpike Authority, No. CIV-93-1836-R (W.D. Okla. filed Jan. 19, 1996)). Second, the district court determined that Mason's claims, although representing alternative theories of recovery, were all based on the same conduct by the defendants, and that Mason was not entitled to receive multiple punitive damage awards. The district court required Mason to elect only one punitive damage award against each defendant. Id. at 1558. The net effect of these alterations to the judgment is that Young remained liable to Mason for a single punitive damage award of $150,000, while Scott remained liable for a single punitive damage award capped at $245,572.70.
 
 
 19
 Also not entirely satisfied with the jury's verdict, Mason moved for a new trial on the issue of compensatory damages. Mason argued that by awarding as compensatory damages an amount exactly equal to the back pay he sought, the jury completely disregarded his nonpecuniary losses. Mason also asserted that the district court's front pay award was inadequate. The district court denied this motion. Id. at 1582.
 
 DISCUSSION
 A. Young's Bankruptcy
 
 20
 While this appeal and cross-appeal were pending, Young's counsel notified us that Young had sought protection under the Bankruptcy Act. Under 11 U.S.C. § 362(a)(1), a bankruptcy petition operates as an automatic stay ofthe commencement or continuation ... of a judicial ... proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title.
 
 
 21
 We directed the parties to advise this court as to their views of the impact of § 362(a)(1) upon this appeal and cross-appeal. Only Mason responded to this order. He argues that Young's bankruptcy does not stay the defendants' appeal because that appeal is not a proceeding against the debtor. Mason further contends that § 362(a)(1) need not stay his cross-appeal with respect to the OTA and Scott because the automatic stay provisions do not apply to non-bankrupt co-defendants. Mason concedes, however, that § 362(a)(1) may stay his cross-appeal with respect to Young.
 
 
 22
 We agree with Mason's assessment. First, this circuit has held that § 362(a)(1) does not prevent a debtor from commencing or continuing his own appeal. Chaussee v. Lyngholm (In re Lyngholm), 24 F.3d 89, 91-92 (10th Cir.1994). Thus, Young's bankruptcy has no affect on our disposition of the appeal brought by Young, Scott, and the OTA. Second, "the rule followed by this circuit and the general rule in other circuits is that the stay provision does not extend to solvent codefendants of the debtor." Oklahoma Federated Gold & Numismatics, Inc. v. Blodgett, 24 F.3d 136, 141 (10th Cir.1994); see also Fortier v. Dona Anna Plaza Partners, 747 F.2d 1324, 1330 (10th Cir.1984). Neither Young nor his co-defendants have suggested any reason for us to depart from this rule in this case and, under these circumstances, we do not find departure essential to serve the policies underlying § 362(a)(1). Accordingly, we decide the issues presented by Mason's cross-appeal with respect to the OTA and Scott, but stay further proceedings in the cross-appeal with respect to Young. See Croyden Assocs. v. Alleco, Inc., 969 F.2d 675, 677 (8th Cir.1992) (staying further proceedings with respect to debtor, but deciding the issues raised on appeal with respect to the co-defendants).
 
 B. Defendants' Appeal
 
 23
 On appeal, the defendants argue that the jury's verdict is not supported by the evidence and that they are entitled to judgment as a matter of law. Alternatively, the defendants contend that a new trial is warranted (1) by the district court's erroneous jury instruction on the issue of pretext, (2) by the district court's improper admission of evidence, (3) by the cumulative effects of misconduct by Plaintiff's counsel, and (4) by the excessiveness of the punitive damage award.
 
 1. Sufficiency of the Evidence
 
 24
 The OTA,[4] Scott, and Young argue that the district court erred in denying their motion for judgment as a matter of law on each of Mason's claims. We review de novo the district court's determination of a motion for judgment as a matter of law, applying the same standard as the district court. Haines v. Fisher, 82 F.3d 1503, 1510 (10th Cir.1996). Under this standard, judgment as a matter of law is warranted only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion. Id. "We do not weigh the evidence, pass on the credibility of the witnesses, or substitute our conclusions for that of the jury. However, we must enter judgment as a matter of law in favor of the moving party if 'there is no legally sufficient evidentiary basis ... with respect to a claim or defense ... under the controlling law.' " Harolds Stores, Inc. v. Dillard Dep't Stores, Inc., 82 F.3d 1533, 1546-47 (10th Cir.) (citations omitted) (quoting Fed.R.Civ.P. 50(a)), cert. denied, --- U.S. ----, 117 S.Ct. 297, 136 L.Ed.2d 216 (1996).
 
 
 25
 a. Section 1983
 
 
 26
 First, the defendants contend there is insufficient evidence to support the jury's verdict on Mason's section 1983 political patronage claim. The First Amendment protects public employees from discrimination based upon their political beliefs, affiliation, or non-affiliation unless their work requires political allegiance. Rutan v. Republican Party of Illinois, 497 U.S. 62, 68-69, 110 S.Ct. 2729, 2733-34, 111 L.Ed.2d 52 (1990); Branti v. Finkel, 445 U.S. 507, 513, 100 S.Ct. 1287, 1292, 63 L.Ed.2d 574 (1980). Here, the defendants do not argue that the position of principal assistant at the OTA requires political allegiance. Thus, to have prevailed on his political discrimination claim, Mason was required to prove by a preponderance of the evidence that his non-affiliation with, or lack of support by, the Democratic party was a "substantial" or "motivating" factor behind his dismissal. Laidley v. McClain, 914 F.2d 1386, 1392 (10th Cir.1990); Brown v. Reardon, 770 F.2d 896, 899 (10th Cir.1985); LaRou v. Ridlon, 98 F.3d 659, 661 (1st Cir.1996).[5]
 
 
 27
 Having reviewed the record, we hold that when all reasonable inferences are drawn in Mason's favor, the jury could reasonably infer that political patronage was a motivating factor in Mason's dismissal. As previously described, the jury heard evidence that Scott told Ridings he wanted to hire Beach as a political favor, and that the Governor's Chief of Staff, Jerry Goodman, also pressured Ridings to hire Beach. Mason, a political independent, testified that Scott was so concerned with finding a permanent position for Beach that he threatened Mason with termination when he learned that Mason opposed giving Beach such a position. Furthermore, Mason presented evidence that Beach received Mason's position shortly after making a campaign contribution to the Governor; that Young, who ultimately terminated Mason and hired Beach, met with the Governor and Goodman shortly after Beach made the contribution; and that Young hired Beach as his principal assistant without ever interviewing him or gaining any serious evaluation of his work, even though Young had met Beach on only one occasion eight years earlier. While this evidence does not compel the conclusion that political patronage motivated Young's decision to discharge Mason, it certainly supports such an inference.
 
 
 28
 We also find the evidence supports the jury's conclusion that Scott participated in, or encouraged, Young's decision to discharge Mason for political patronage. The jury heard that Scott had pressured Young's predecessor to hire Beach, and that Scott had threatened Mason that Beach might have Mason's job "one of these days." Young met with Scott, the Chairman of the OTA's personnel committee, on the very day that a detailed, written record of a plan to discharge Mason was completed. Mason testified that Young told him Scott had approved his discharge.
 
 
 29
 Furthermore, the jury was entitled to disbelieve Young's testimony regarding the independence of his decision-making. The jury may have found it peculiar that Young would hire as his principal assistant a person he barely knew and had never interviewed. They may have found incredible Young's claim that even though he spoke with Scott, the personnel chairman, on March 19, Young never mentioned the fact that he planned to terminate the OTA's Chief Financial Officer on March 22. The jury also was entitled to disbelieve Scott's denials and conclude that Scott in fact accomplished what he had earlier threatened--namely, to terminate Mason and hire Beach. See Anthony v. Sundlun, 952 F.2d 603, 606 (1st Cir.1991) ("Notwithstanding a person's disclaimers, a contrary state of mind may be inferred from what he does and from a factual mosaic tending to show that he really meant to accomplish that which he professes not to have intended.").
 
 
 30
 The defendants argue, however, that political patronage could not have caused Mason's discharge because Young planned to terminate Mason in any event as part of a legitimate reorganization. This argument fails for at least two reasons. First, the jury may simply have disbelieved Young's testimony regarding his reorganization plans. Second, even if the jury did believe there was a legitimate motive behind Mason's discharge, it still may have concluded that other illegitimate factors also motivated the decision. Mason was not required to prove that political patronage was the sole cause behind his discharge. Rather, once Mason proved political patronage was a motivating factor behind his dismissal, the burden of persuasion shifted to the defendants to prove, as an affirmative defense, that the discharge would have occurred regardless of any discriminatory political motivation. Gardetto v. Mason, 100 F.3d 803, 811 (10th Cir.1996); see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); Price Waterhouse v. Hopkins, 490 U.S. 228, 250, 109 S.Ct. 1775, 1790, 104 L.Ed.2d 268 (1989) (" 'The employer is a wrongdoer; he has acted out of a motive that is declared illegitimate by the statute. It is fair that he bear the risk that the influence of legal and illegal motives cannot be separated ....' " (quoting NLRB v. Transportation Management Corp., 462 U.S. 393, 403, 103 S.Ct. 2469, 2475, 76 L.Ed.2d 667 (1983))). The defendants never requested a jury instruction on such an affirmative defense and, in any event, we cannot say the record compels the conclusion that Mason would have been dismissed even absent the discriminatory motivation. See Acevedo-Diaz v. Aponte, 1 F.3d 62, 67 (1st Cir.1993). The district court did not err in denying the defendants' motion for judgment as a matter of law on the section 1983 claim.
 
 
 31
 b. Wrongful Discharge
 
 
 32
 Oklahoma state law forbids an employee's discharge for refusal to participate in an illegal activity, when that discharge is coupled with a showing of bad faith, malice or retaliation. Groce v. Foster, 880 P.2d 902, 904-05 (Okla.1994). To warrant submission of such a wrongful discharge claim to the jury, a plaintiff must present sufficient evidence from which a jury could reasonably conclude that the discharge was significantly motivated by the plaintiff's refusal to violate the law. White v. American Airlines, Inc., 915 F.2d 1414, 1421 (10th Cir.1990). The defendants contend that Mason failed to meet this burden. We disagree.
 
 
 33
 At trial, Mason presented evidence that he openly opposed the use of surplus funds for the construction of the Coweta Toll Plaza. Mason testified that when Young learned of this opposition, he told Mason that Scott would be very upset. Jim Berry testified that, less than a week before Mason's discharge, Scott threatened to "get a new Chief Financial Officer" if Mason continued to oppose the toll plaza. Similarly, Mason testified that just six days before his discharge Scott told him, "[I]f you continue to obstruct this [toll plaza] project, I'll have your job." Three days later, Scott met with Young and a written plan to discharge Mason was completed. These direct threats of retaliation, coupled with the timing of the discharge, sufficiently support the jury's conclusion that retaliation against Mason for his opposition to illegal activity significantly motivated his discharge. See Wallace v. Halliburton Co., 850 P.2d 1056, 1059 (Okla.1993) (timing may be evidence of a retaliatory discharge). Though both Scott and Young vehemently denied any retaliatory motive, it was for the jury to weigh and assess the evidence.[6]
 
 
 34
 The defendants argue that such retaliation could not have caused Mason's discharge because he would have been terminated in any event as part of a reorganization. But, as with his political patronage claim, Mason was not required to prove that retaliation was the sole motivation behind his discharge. Instead, he need only have proved that retaliation was a significant factor. As evidenced by the verdict, the jury plainly believed that Mason's discharge was caused by at least two motives: political patronage and retaliation. While a third, legitimate motive (reorganization) may also have motivated the discharge, this does not preclude liability. The district court did not err in denying judgment as a matter of law.[7]
 
 
 35
 c. Tortious Interference with Employment Relationship
 
 
 36
 The jury found Sam Scott liable for tortious interference in Mason's contractual relationship with the OTA. In order to support such a verdict, Mason need have presented sufficient evidence from which a jury could reasonably conclude that (1) Mason had a contractual right which was interfered with; (2) the interference was wrongful and malicious; (3) the interference was neither justified, privileged, nor excusable; and (4) damages were proximately sustained as a result of the interference. Johnson v. Nasca, 802 P.2d 1294, 1297 (Okla.App.1990). On appeal, Scott argues that, as an OTA member, he was not a third party to Mason's contract and was legally incapable of tortious interference. Scott also argues that even if he were legally capable of interfering in Mason's contract, Mason did not present sufficient evidence of such interference.
 
 
 37
 The Oklahoma Supreme Court has not directly addressed whether a corporate officer, director or other employee can be held liable for tortiously interfering in a corporate contract.[8] We are convinced, however, that corporate employees can be found liable under Oklahoma law for tortious interference with a corporate contract. See Johnson, 802 P.2d at 1297 (suggesting a tortious interference claim could be stated against the supervisor who actually made the decision to terminate the plaintiff). As with any tortious interference claim, the determinative issue remains whether the actor's interference was justified, privileged, or excusable. The Oklahoma Supreme Court has held that "it is not unlawful for one to 'interfere with the contractual relations of another if [this is done] by fair means, if [it is] accomplished by honest intent, and if [it is done] to better one's own business and not to principally harm another.' " Morrow Dev. Corp. v. American Bank & Trust, 875 P.2d 411, 416 n. 21 (Okla.1994) (alterations in original) (quoting Del State Bank v. Salmon, 548 P.2d 1024, 1027 (Okla.1976)). Therefore, a corporate officer's or director's interference with a corporate contract will be privileged only when the interference is undertaken in good faith and for a bona fide organizational purpose. Q.E.R., Inc. v. Hickerson, 880 F.2d 1178, 1184 (10th Cir.1989) (applying Colorado law); Allison v. American Airlines, Inc., 112 F.Supp. 37, 38 (N.D.Okla.1953).
 
 
 38
 The Restatement suggests consideration of the following factors in determining whether a person acted improperly in interfering in a contract or prospective contract:
 
 
 39
 (a) the nature of the actor's conduct,
 
 
 40
 (b) the actor's motive,(c) the interests of the other with which the actor's conduct interferes,
 
 
 41
 (d) the interests sought to be advanced by the actor,
 
 
 42
 (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
 
 
 43
 (f) the proximity or remoteness of the actor's conduct to the interference and
 
 
 44
 (g) the relations between the parties.
 
 
 45
 Restatement (Second) of Torts § 767 (1979); see also Morrow, 875 P.2d at 416 (noting the relevance of the Restatement in delineating the elements of tortious interference). When a corporate officer or director seeks the termination of a fellow employee for reasons that violate both public policy and the employee's constitutional rights, that officer or director does not act with an honest intent or for a bona fide organizational purpose, and the factors suggested by the Restatement weigh heavily in favor of finding that such interference is not justified. See, e.g., Petroskey v. Lommen, Nelson, Cole, & Stageberg, 847 F.Supp. 1437, 1450 (D.Minn.1994), aff'd, 40 F.3d 278 (8th Cir.1994) (noting that an employer's officer or agent may be liable for tortious interference if the motivation underlying the interference was sufficiently improper to establish a claim against the employer for wrongful discharge). Scott's status as an OTA member did not preclude submission of Mason's tortious interference claim to the jury.
 
 
 46
 Furthermore, we have already delineated the evidence in the record from which the jury could reasonably have inferred that Scott participated in, and encouraged, Young's decision to discharge Mason. This same evidence supports the jury's finding that Scott interfered in Mason's employment relationship. The district court did not err in denying judgment as a matter of law on this claim.
 
 2. Jury Instructions on Pretext
 
 47
 The defendants next argue that the district court erred in instructing the jury on the issue of pretext. In reviewing jury instructions, "we consider all the jury heard, and from the standpoint of the jury, decide not whether the charge was faultless in every particular, but whether the jury was misled in any way and whether it had understanding of the issues and its duties to determine these issues." Considine v. Newspaper Agency Corp., 43 F.3d 1349, 1365 (10th Cir.1994) (quotations and citations omitted). While the instruction as a whole must convey the correct statement of the applicable law, no particular form is essential. Id. We reverse an erroneous jury instruction only when we have substantial doubt whether the instructions, considered as a whole, properly guided the jury in its deliberations. Id.
 
 
 48
 After instructing the jury on the elements of Mason's political patronage claim, the district court gave the following instruction regarding pretext:
 
 
 49
 The Defendants in this case allege that the Oklahoma Turnpike Authority had a legitimate reason for terminating the Plaintiff, i.e., an agency reorganization. The Defendants do not bear the burden of proof with respect to the reason for terminating the Plaintiff. Thus, the Plaintiff can prevail only if he proves, by a preponderance of the evidence, that political patronage was a substantial or motivating factor in the decision to terminate him, in addition to any legitimate, non-discriminatory reasons.
 
 
 50
 If you find that the stated reasons given by the Defendants are inconsistent or implausible, or that the Defendants have substantially deviated from their own practices or customs, then you may conclude that the offered explanation is a mere pretext for political patronage. If you find pretext, you may also infer that political patronage was a substantial or motivating factor in the employment decision; though you are not required to draw such an inference.
 
 
 51
 If you do not find that the Defendants' explanations were a mere pretext, you must still consider whether political patronage was a determining factor in the Plaintiff's termination.
 
 
 52
 The Plaintiff is not required to prove that political patronage was the sole motivation or the primary motivation for the Defendants' decision to terminate his employment. The Plaintiff need only prove that political patronage was a substantial or motivating factor in the decision to discharge him.
 
 
 53
 App. Vol. II at 652. The court gave a similar instruction with respect to Mason's wrongful discharge claim.
 
 
 54
 The defendants contend that the court's pretext instructions allowed the jury to find for Mason solely by disbelieving the defendants' explanation for the discharge. We disagree. The instructions repeatedly and accurately place the burden of proof upon the plaintiff to prove that political patronage and/or retaliation was a substantial or motivating factor in the employment decision. With respect to pretext, the instructions merely informed the jury that, if it disbelieved the defendants' proffered reason for the discharge, then it may, but need not, infer that an illegitimate motive existed. The jury would be permitted (but not required) to draw such an inference because Mason had already presented sufficient evidence of political patronage and retaliation--i.e., sufficient evidence of a prima facie case--to warrant submission of those claims to the jury. Once Mason presented such evidence, a finding of pretext is simply inferential evidence of discriminatory animus that may aid the jury in answering the ultimate question: Did political patronage and/or retaliation motivate the employment decision? See Randle v. City of Aurora, 69 F.3d 441, 451 (10th Cir.1995) ("The defendant fails to appreciate that the Supreme Court has said that discriminatory animus may be inferred from the simple showing of pretext. Thus, a showing of pretext is evidence which allows a jury to infer discriminatory intent.").[9]
 
 
 55
 Furthermore, we reject the defendants' additional argument that pretext is relevant in Title VII, but not section 1983 actions. When an employer's intent is the ultimate issue, the jury's disbelief of the employer's proffered reasons for a termination will typically, if not always, be relevant to its ultimate determination. See Laidley v. McClain, 914 F.2d 1386, 1393-94 (10th Cir.1990) ("The absence of any legitimate motive for the plaintiff's termination makes it more likely that other motives, such as political patronage, were behind the decision to fire the plaintiff."); Howard v. Senkowski, 986 F.2d 24, 27 n. 2 (2d Cir.1993) ("Though pretext analysis was developed in Title VII cases, ... it is fully applicable to constitutional claims where the issue is whether an improper motive existed ...."); see also Brown v. MFC Finance Co. of Oklahoma, 838 P.2d 524, 527 (Okla.App.1992) (applying pretext analysis to a retaliatory discharge claim).[10] In sum, we hold that the court's instruction properly guided the jury, and is not grounds for reversal.
 
 
 56
 3. Alleged Error in the Admission of Evidence
 
 
 57
 Without citing any authority, the defendants contend the district court committed reversible error in allowing Mason's counsel to question Young regarding the hiring of Steve Hill and Dianne England at the OTA. Over the defendants' objection to the line of questioning, Young testified that Governor Walters circulated to the OTA and other public agencies a list of his staff members who would need work after the Governor left office. Young testified that he hired Hill and England off the list, and that Hill and England were placed on the OTA payroll even though they did not actually perform any work at the OTA. The defendants argue that this evidence was "highly prejudicial" and had "no factual similarity to the termination of the Plaintiff." Appellant's Br. at 44.
 
 
 58
 The district court did not abuse its broad discretion in allowing this questioning. At trial, Young flatly denied ever engaging in political patronage hiring during his tenure as Managing Director of the OTA. Without resorting to any extrinsic evidence, counsel for Mason merely attempted to elicit Young's admission that, in fact, he had personally hired Hill and England for political patronage purposes. As the district court correctly noted, such questioning was admissible to impeach Young by contradiction. See United States v. Greschner, 802 F.2d 373, 383 (10th Cir.1986) (holding that trial court had discretion, under Fed.R.Evid. 608(b) and the doctrine of specific contradiction, to allow questioning designed to elicit witness's admission that he had testified falsely at trial).
 
 4. Misconduct of Counsel
 
 59
 The defendants assert that the misconduct of Mason's counsel, when viewed as a whole, warrants a new trial. The defendants identify, among others, the following instances of alleged misconduct:
 
 
 60
 Counsel's questions concerning matters excluded by the district court, such as alleged promises to Mason that he would not be terminated for political reasons;
 
 
 61
 Attempting to offer into evidence excerpts from depositions which counsel had not designated in advance;
 
 
 62
 Questioning witnesses concerning such matters as the alleged awarding of patronage contracts;
 
 
 63
 Questioning Scott concerning trips to Paris by OTA members;
 
 
 64
 Questioning Beach about providing legislators with alcohol without first establishing an evidentiary foundation;
 
 
 65
 Alluding, during cross-examination, to Scott's involvement in a grand-jury investigation of former Governor Walters;
 
 
 66
 Telling the jury during closing arguments that Jerry Goodman told Mr. Young to hire James Beach when there was no evidentiary support for such a statement;
 
 
 67
 Telling the jury during closing arguments that Berry testified Scott threatened Mason's employment because of his opposition to the hiring of James Beach, when, in fact, the threat related to Mason's opposition to the Coweta Toll Plaza.
 
 
 68
 "The decision whether misconduct in a trial has been so egregious as to require retrial is largely left to the discretion of the trial court," Angelo v. Armstrong World Industries, Inc., 11 F.3d 957, 962 (10th Cir.1993) (quoting Polson v. Davis, 895 F.2d 705, 711 (10th Cir.1990)), and we reverse only if the district court clearly abused its discretion. Id. Furthermore, a new trial may be required only if the moving party shows that it was prejudiced by the attorney misconduct. Id.
 
 
 69
 Having reviewed the record, we find the misconduct was not so pervasive or alarming as the defendants contend. Instead, it played a small role in a trial with many legitimate disputes between counsel over the relevance of several factual matters and the boundaries of orders in limine. Furthermore, the district court gave the jury curative instructions following the most serious misconduct. When counsel improperly broached the topic of whether Mason had received promises of job security, the district court explained to the jury that the court had already determined Mason was an at-will employee. Later, when counsel referred to Scott's involvement in the grand-jury investigation, the district court immediately sustained an objection and instructed the jury to disregard the question. App. Vol. IV at 1050. We presume that juries follow the court's instructions, United States v. Coleman, 7 F.3d 1500, 1506 (10th Cir.1993), and we have no reason to believe that a different result would have occurred in the absence of the misconduct. The district court did not clearly abuse its discretion in determining that a new trial was not warranted.
 
 
 70
 5. Excessiveness of the Punitive Damages Award
 
 
 71
 Finally, Scott and Young argue that the punitive damages awarded against them are excessive. As explained below, Mason's cross-appeal necessitates that we remand the issue of punitive damages against Scott for reconsideration by the district court, and stay the issue with respect to Young. Therefore, we do not reach the issue of excessiveness, and we express no opinion with respect to it.
 
 C. Plaintiff's Cross-Appeal
 
 72
 On cross-appeal, Mason seeks a new trial on the issue of compensatory damages, alleging (1) that the jury failed to follow the district court's instructions with respect to Mason's nonpecuniary losses, and (2) that the district court abused its discretion by awarding insufficient front pay. Mason also contends that the district court erred in requiring him to elect only one punitive damage award against each defendant.
 
 1. Nonpecuniary Losses
 
 73
 The jury awarded Mason $185,572.70 in compensatory damages, an amount exactly equal to the back pay Mason requested. Mason moved for a new trial on the issue of compensatory damages, arguing that the jury's failure to award any compensation for his mental anguish demonstrates that the jury ignored the court's instructions, as well as the evidence. The district court denied this motion, concluding that "[u]nder the evidence presented in this case, the jury was entitled to disbelieve the Plaintiff's testimony and award nothing for emotional distress." App. Vol. VI at 1581.
 
 
 74
 "In reviewing the trial judge's determination that the damages awarded by the jury were not so inadequate as to require a new trial, we are to determine whether the trial judge has abused his discretion." Black v. Hieb's Enters., Inc., 805 F.2d 360, 362 (10th Cir.1986). No abuse of discretion will be found unless the award is so inadequate that it shocks the judicial conscience and raises an irresistible inference that passion, prejudice, corruption, or other improper cause invaded the trial. Id. Absent such a showing, the jury's finding on damages is inviolate. Id.
 
 
 75
 We agree with the district court that the jury in this case was entitled to award nothing against the OTA and Scott for Mason's alleged mental anguish. The only evidence presented by Mason regarding such suffering was his own, uncorroborated testimony that since his discharge from the OTA he had experienced depression, estrangement from his family, distrust for others, and similar emotional strains. Mason did not present any expert testimony regarding the cause or severity of his alleged symptoms. Similarly, no family members or friends were called to attest to changes in Mason's behavior. During closing arguments, Mason's counsel did not review the scant evidence offered on the issue of mental anguish, instead telling the jury, "I'm sure you'll remember it." App. Vol. V at 1374.[11] Unlike this court, the jury had the opportunity to observe Mason and credit or discredit his testimony regarding his alleged mental anguish. Under such circumstances, we cannot say the jury's refusal to compensate Mason for his alleged mental anguish shocks the judicial conscience, or raises an inference of passion or prejudice. See Jackson & Coker, Inc. v. Lynam, 840 F.Supp. 1040, 1050 (E.D.Pa.1993), aff'd, 31 F.3d 1172 (3d Cir.1994) (finding that the issue of emotional distress was one "easily understood by the jury," and that the jury, in awarding no damages for emotional distress, may simply have disbelieved the plaintiff's uncorroborated evidence on the issue).[12]
 
 
 76
 Additionally, we reject Mason's contention that the verdict form was "sufficiently confusing to the jurors as to cause them to neglect to consider any award to Mason for his nonpecuniary loses [sic]." Appellee's/Cross-Appellant's Br. at 18. Although the verdict form requested only a single compensatory damages sum, the jury instructions thoroughly and clearly explained the nature and availability of compensation for both pecuniary and nonpecuniary losses. When the jury asked during deliberations that the district court "please list dollar amounts Plaintiff is seeking from Defendants," App. Vol. V at 1407, the district court referred the jury to those accurate instructions. Mason's counsel did not object to the district court's response to the jury's question or request any additions to it. Id. We find no reason to believe the jurors were confused in any way.
 
 2. Front Pay
 
 77
 Mason next contends the district court abused its discretion in awarding him only $60,000 in front pay. The district court made this award based on its finding that "[c]onsidering the Plaintiff's work history, education level, his overall employment record, and all other relevant factors before the Court, the Plaintiff could, with reasonable effort, be re-employed in a reasonably comparable position with comparable pay and benefits within two years." App. Vol. VI at 1435 (Mason v. Oklahoma Turnpike Authority, No. CIV-93-1836-R (W.D.Okla. Oct. 11, 1995)). By contrast, Mason had sought an award of $606,681, an amount premised on the assumption that he would not obtain comparable employment for the next twenty-five years.
 
 
 78
 Under section 1983, front pay is an equitable, discretionary remedy. Starrett v. Wadley, 876 F.2d 808, 824 (10th Cir.1989). In determining whether, and how much, front pay is appropriate, the district court "must attempt to make the plaintiff whole, yet the court must avoid granting the plaintiff a windfall." Standley v. Chilhowee R-IV School District, 5 F.3d 319, 322 (8th Cir.1993); see also Carter v. Sedgwick County, Kansas, 36 F.3d 952, 957 (10th Cir.1994) (stating, in the context of a Title VII case, that front pay should "make plaintiff whole"). Because determining a front pay award requires the district court to predict future events and consider many complicated and interlocking factors, we review such awards with considerable deference, reversing only for an abuse of discretion. See Starrett, 876 F.2d at 824.
 
 
 79
 Here, we are satisfied the district court considered the appropriate factors and acted well within its discretion in determining that a front-pay period of two years would make Mason whole. Prior to determining Mason's front pay award, the district court heard the extensive testimony of each side's expert witness. The court also considered Mason's positive work history and impressive credentials. Mason holds an MBA, as well as a Juris Doctorate degree. He has served as the finance director of Oklahoma City, Davenport, Iowa, and other municipalities. His resume shows a history of constant, upward advancement. The court properly weighed these positive factors along with the potentially negative impact Mason's discharge and subsequent bankruptcy might have on potential employers. Mason has not shown an abuse of discretion, and we affirm the front-pay award.[13]
 
 3. Punitive Damages
 
 80
 Finally, Mason argues that the district court erred in requiring him to elect a single punitive damage award against Scott.[14] The jury awarded Mason $150,000 against Young and $150,000 against Scott on the section 1983 claim, $150,000 against Young and $250,000 against Scott on the wrongful discharge claim, and $300,000 against Scott on the tortious interference claim. Following the verdict, the defendants moved to alter and amend the judgment, requesting, among other things, that the district court "[i]ndicate that the multiple punitive damage awards as to each individual Defendant are alternative rather than cumulative." App. Vol. VI at 1480. Mason opposed this motion, arguing the defendants had failed to object on this basis to the verdict form, which specifically asked the jury to award punitive damages against each defendant on each separate claim. Mason also argued that the punitive damage awards were not duplicative because each of his claims involved different conduct by the defendants.
 
 
 81
 The district court found that the "Defendants' termination of the Plaintiff's employment is at the core of all of the Plaintiffs' [sic] claims for punitive damages," and that Mason was not entitled to recover multiple punitive damage awards. App. Vol. VI at 1558. The court required Mason to elect one punitive damage award against Young and one against Scott. Reluctantly, Mason elected the $150,000 punitive damage award assessed against Young on the section 1983 claim, and the $245,572.70[15] assessed against Scott on the tortious interference claim. On appeal, Mason renews his contention that the awards against Scott are not duplicative and that, in any event, Scott waived the issue by failing to object on this basis to the jury instructions or verdict form.
 
 
 82
 It is well established that "double recovery is precluded when alternative theories seeking the same relief are pled and tried together." Clappier v. Flynn, 605 F.2d 519, 530 (10th Cir.1979); see also MidAmerica Fed. Sav. & Loan Assoc. v. Shearson/American Express, Inc., 962 F.2d 1470, 1473 (10th Cir.1992). "If a federal claim and a state claim arise from the same operative facts, and seek identical relief, an award of damages under both theories will constitute double recovery." U.S. Industries, Inc. v. Touche Ross & Co., 854 F.2d 1223, 1259 (10th Cir.1988). Where a jury award duplicates damages, the court, either sua sponte or on motion of a party, should reduce the judgment by the amount of the duplication. Id. at 1259-60. The question of whether damage awards are duplicative is one of fact, reviewable under the clearly erroneous standard. Id. at 1259 n. 53.
 
 
 83
 Although the rule against double recovery arises most often in the context of compensatory damages,[16] it applies to punitive damages as well. For instance, courts have held frequently that a plaintiff may not recover both punitive damages under a state tort law claim and treble damages under a federal statutory claim, where the state and federal claims arise from the same operative facts and merely represent alternative theories of recovery. See, e.g., Fineman v. Armstrong World Industries, Inc., 980 F.2d 171, 218 (3d Cir.1992); SuperTurf, Inc. v. Monsanto Co., 660 F.2d 1275, 1283-84 (8th Cir.1981).
 
 
 84
 While Scott's failure to raise the issue of potential duplication prior to the jury's retirement would likely have prevented him from raising the issue on appeal, see Fed.R.Civ.P. 51,[17] we do not believe that it prevented the district court, under these circumstances, from exercising its duty to prevent double recovery in the first instance. As evidenced by this case, however, a district court must exercise caution in determining whether two or more punitive damage awards are duplicative, particularly where Scott was not especially vigilant in protecting against such error. Punitive damages are not designed to compensate the victim, but to punish and deter conduct of the offending party. In some cases, multiple punitive damage awards on overlapping theories of recovery may not be duplicative at all, but may instead represent the jury's proper effort to punish and deter all the improper conduct underlying the verdict. See Robertson Oil Co. v. Phillips Petroleum Co., 14 F.3d 373, 383 (8th Cir.1993) (affirming separate punitive damage awards on overlapping tortious interference and fraud claims where the "nature, extent, and enormity of the wrong, [and] the intent of the party committing it" differ with respect to each of the awards). Here, although the district court was correct in noting that Mason's discharge is "at the core" of all of his claims, it is clear the jury found the discharge was motivated by two distinct, illegal factors: (1) political discrimination; and (2) retaliation for Mason's refusal to violate state law. One motivation violated Mason's constitutional rights, while the other violated Oklahoma public policy. Society has an interest in punishing Scott for both illegitimate intents. In other words, while punitive damage awards on both a section 1983 and wrongful discharge claim may, in some cases, constitute double recovery, such awards are not duplicative per se.
 
 
 85
 Had the jury awarded Mason a single punitive damage award against Scott accounting for both political patronage and retaliation, it would be difficult for Scott to prove duplication. Confusion arises only because the verdict form requested the jury to award a separate amount of punitive damages against each defendant on each claim, and the jury received no explicit instructions regarding its obligation not to consider overlapping conduct on each claim. While the punitive damage awards against Scott on the section 1983 and wrongful discharge claim may include some duplication, it is very probable that they also represent at least some purposeful apportionment by the jury, as evidenced by the disparate sizes of the awards. Merely requiring Mason to elect a single claim does not take into account any of the jury's apportionment. We hold the district court abused its discretion in requiring Mason to elect a single award against Scott.
 
 
 86
 Nevertheless, we recognize there may indeed be some duplication, particularly with respect to the punitive damages assessed against Scott on the tortious interference claim.[18] Thus, although we reverse the portion of the district court's January 19, 1996, order requiring an election of a single punitive damage award against Scott, we remand the issue of duplication for reconsideration. Because reconsideration may result in a change in the total amount of punitive damages awarded, the district court also may, in its discretion, reconsider the issues raised by Scott with respect to excessiveness.
 
 4. Attorney's Fees on Appeal
 
 87
 Finally, Mason requests attorney's fees for this appeal and cross-appeal. Having succeeded on substantial issues, Mason is entitled to attorney's fees under § 1988 in an amount to be calculated by the district court on remand. The fees awarded should account for the degree of success obtained. Consistent with the automatic stay, no fees may be assessed against Young at this time.
 
 CONCLUSION
 
 88
 We STAY consideration of the issues presented by Mason's cross-appeal with respect to Young. We REVERSE the portion of the district court's January 19, 1996, order requiring Plaintiff to make an election of punitive damages against Scott, and REMAND the issue for reconsideration. On remand, the district court shall award Mason an appropriate attorney's fee for this appeal and cross-appeal. We AFFIRM in all other respects.[19]
 
 
 
 [1]
 Hereinafter, we use "defendants" to refer to the OTA, Sam Scott, and Terry Young
 
 
 [2]
 During Ridings' tenure, the office of Managing Director was referred to as Chief Executive Officer. To avoid confusion, we use the title Managing Director throughout this opinion
 
 
 [3]
 By statute, the OTA is immune from punitive damages
 
 
 [4]
 On appeal, the OTA does not make any arguments regarding the nature of its liability for the acts of Scott and Young, other than to state that if the verdicts against Scott and Young are reversed, then there is no "derivative liability" against the OTA. Appellant's Br. at 34. In the absence of any other argument, we take this as a concession that affirmance of the verdict against Scott and Young amounts to affirmance of the verdict against the OTA
 
 
 [5]
 The Supreme Court has explained that in establishing a constitutional violation the plaintiff need not prove that the discharge was punitive or that the employer actually tried to coerce the plaintiff to alter his political views. Instead, it is enough to show that the plaintiff was discharged to make room for a person with political sponsorship the plaintiff lacked. Rutan, 497 U.S. at 71, 110 S.Ct. at 2735. This rule protects against " 'the coercion of belief that necessarily flows from the knowledge that one must have a sponsor in the dominant party in order to retain one's job.' " Id. (quoting Branti, 445 U.S. at 516, 100 S.Ct. at 1293-94)
 
 
 [6]
 On appeal, the defendants contend that Mason's wrongful discharge claim must fail because sufficient funds existed in the general account to finance legally the construction of the Coweta Toll Plaza. Hence, the defendants argue that, as a matter of law, discharging Mason in retaliation for his opposition to the toll plaza could not have violated Oklahoma public policy. In the district court's post-trial order denying the defendants a new trial and judgment as a matter of law, the court recognized that "a potential issue may exist as to whether a plaintiff should be required to show that the conduct he refused to engage in would have actually violated the law, or whether a plaintiff may prevail by showing that he reasonably believed that the conduct would have violated the law." App. Vol. VI at 1551. The district court found it unnecessary to resolve this issue because the defendant had not properly raised it
 We agree with the district court that the defendants never expressly raised this issue. In any event, the defendants' argument misses the mark. The defendants do not claim it would have been legal to use surplus funds to build the toll plaza. Instead, they merely argue that sufficient general funds were available for the project. The availability of general funds does not impact the separate issue of whether retaliation against Mason for his opposition to the use of surplus funds violated public policy.
 
 
 [7]
 Because Mason's evidence relating to retaliation for his opposition to the Coweta Toll Plaza provides a legally sufficient basis for the jury's verdict on his wrongful discharge claim, we need not address Mason's additional argument that the evidence supports the conclusion that he was terminated for his opposition to the hiring of James Beach
 
 
 [8]
 In Hinson v. Cameron, 742 P.2d 549, 551 (Okla.1987), the Oklahoma Supreme Court suggested in dicta that such a cause of action may exist: "Since Hinson makes no argument here that the supervisor improperly or tortiously interfered with her employment relation, we need not pause to consider whether the evidentiary material before us would support Hinson's tort claim against the supervisor alone for actionable interference with her employment status."
 
 
 [9]
 The defendants also argue that the instruction should not have been given because "Plaintiff offered no proof of pretext to justify any pretext instruction." Appellant's Br. at 46. To the contrary, there was reason for the jury to disbelieve Young's testimony that he discharged Mason merely to facilitate a reorganization and to take advantage of Beach's talents. For example, although Young claimed to be highly interested in Beach's capabilities, the jury heard that Young had never interviewed Beach, had not received any significant evaluations of Beach's work, and had only met Beach on one occasion eight years earlier
 
 
 [10]
 Of course, as the jury instructions note and as we have already explained, the jury could have found for Mason even if it believed that a legitimate reorganization was a factor in the employment decision. Both legitimate and illegitimate factors may have motivated the decision
 
 
 [11]
 During closing arguments, counsel asked the jury for an amount between one and ten million dollars as compensation for Mason's mental anguish. As explanation for this request, counsel stated:
 And if that sounds like a lot of money to you, think about it: We live in a society in which we all know that large amounts of money are sometimes given to people for next to nothing. We all read in the newspapers about Mike Tyson getting in the boxing ring and getting paid $6.5 million for five minutes worth of punishment, and a week later he was back to form and looking forward to his next fight. Six-and-a-half million dollars for five minutes of punishment.
 Mr. Mason has suffered two years of punishment that he never deserved, never deserved because he did nothing other than want to obey the law.
 App. Vol. V at 1373-74.
 
 
 [12]
 In arguing the contrary, Mason relies on Brown v. Richard H. Wacholz, Inc., 467 F.2d 18 (10th Cir.1972), where we ordered a new trial upon determining the jury had disregarded a portion of the damages suffered by the plaintiff as a result of a permanent physical disability caused by the defendant. In Brown, the jury award the plaintiff an amount exactly equal to his out-of-pocket expenses for hospital and medical bills, even though medical testimony established that the plaintiff's injury caused permanent disability in the right leg. Id. at 19. Unlike the plaintiff in Brown, Mason presented no evidence regarding his pain and suffering other than his own general and subjective opinion
 
 
 [13]
 In arguing the court abused its discretion, Mason notes that although the two-year period has nearly expired, he has yet to obtain comparable employment. This does not warrant reversal. We do not expect district courts to predict the future with absolute precision. Furthermore, in determining whether a district court abused its discretion, we review the record before the court at the time of its decision, not events allegedly occurring thereafter. See Boone v. Carlsbad Bancorporation, Inc., 972 F.2d 1545, 1549 n. 1 (10th Cir.1992)
 
 
 [14]
 Mason makes the same argument with respect to punitive damages assessed against Young, but we do not reach this argument with respect to Young because of the automatic stay on proceedings against him
 
 
 [15]
 As previously explained, the district court capped the punitive damages assessed against Scott on the wrongful discharge and tortious interference claims at $245,572.70 each. Mason does challenge that ruling on appeal
 
 
 [16]
 All parties agree in this case that Mason is entitled to only one award of compensatory damages, even though he could have recovered complete compensation under any one of his three claims
 
 
 [17]
 The defendants did not allege any error in the jury instructions, but instead moved to amend the judgment to remove an ambiguity in the verdict. Mason argues, however, that the motion to amend is the equivalent of an allegation of error in either the verdict form or instructions
 
 
 [18]
 As the district court noted, it is difficult to distinguish the conduct and motivations underlying Scott's liability for punitive damages on the section 1983 and wrongful discharge claims from that underlying his liability on the tortious interference claim
 
 
 [19]
 In his brief, Mason states that he seeks review of the district court's summary judgment rulings "only in the event that relief is granted by this Court upon the issues raised by the Appellants in their appeal. That is, if this Court rejects all aspects of Appellants' appeal, then Mason will waive his right to review of the district court's summary judgment rulings." Appellee's/Cross-Appellant's Br. at 10. We do not recommend that parties place such opaque conditions on their rights to review. However, because this court has not granted the defendants any of the relief they requested, we will, consistent with Mason's request, refrain from reviewing the district court's summary judgment order