**F I L E D**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

JOANN D. HABERMAN,

       Plaintiff - Appellee,

v.

THE HARTFORD INSURANCE
GROUP, d/b/a HARTFORD
INSURANCE COMPANY OF THE
MIDWEST,

       Defendant - Appellant.

Nos. 03-6338
03-6340

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. No. CIV-01-1329-T)**

---

Christopher M. Murphy (Brently C. Olsson with him on the brief), Hartford Insurance
Company of the Midwest, Oklahoma City, Oklahoma, for the Appellant.

Elizabeth R. Castleberry, Esq. (James A. Scimeca, Esq. and Jack S. Dawson, Esq., with
her on the brief), Miller Dollarhide, Oklahoma City, Oklahoma, for the Appellee.

---

Before **BRISCOE**, **HOLLOWAY** and **SEYMOUR**, Circuit Judges.

---

**HOLLOWAY**, Circuit Judge.

---

      This appeal arises out of an uninsured motorist coverage dispute between the

Defendant Hartford Insurance Group, d/b/a Hartford Insurance Company of the Midwest, a Connecticut Corporation (the "Hartford"), and Oklahoma Plaintiff Dr. JoAnn D. Haberman ("Haberman"). The Hartford appeals from a final Amended Judgment entered on a jury verdict in favor of Haberman. The Hartford also challenges the denial of its summary judgment motion. In a cross-appeal, Haberman appeals from the denial of her motion for new trial and to amend the judgment. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and **AFFIRM**.

## BACKGROUND

Plaintiff Haberman is the sole shareholder of a professional corporation, Breast Cancer Screening Center of Oklahoma, Inc. On August 20, 2000, Haberman and her office manager, Tamara Moomey, were returning to Oklahoma City from a pleasure trip in Dallas, Texas. Moomey was the driver and owner of a 2000 Mercury SUV that was headed northbound on I-35 just five miles south of Davis, Oklahoma. Moomey lost control of the SUV and spun off the highway, killing herself and injuring Haberman who sustained a fractured pelvis and multiple contusions.

Moomey's insurer, GEICO Direct, settled with Haberman for its liability limits of $50,000 and an additional $50,000 on Moomey's Uninsured Motorist policy. Haberman then attempted to pursue a further claim for benefits under the Uninsured Motorist (UM) provisions of her policy through the Breast Cancer Screening Center. However, the 2000 Mercury SUV was not a scheduled vehicle under the Center's commercial insurance

policy.

On some date,[1] prior to the accident, the Center had taken out a Special Multi-Flex Commercial Business insurance policy with the Hartford. Haberman did not personally pay insurance premiums to the Hartford for the policy; rather the Center paid the premiums. The Center was the "named insured" for all lines of coverage under the policy, including the uninsured motorist (UM) provision under the commercial automobile section.

## A. Relevant Provisions of the Policy

The policy included subsections entitled "Commercial Auto Coverage Part" and "Business Auto Coverage Form." The Business Auto Coverage Form provides in pertinent part: "Throughout this policy the words 'you' and 'your' refer to the Named Insured shown in the Declarations." In Section II - Liability Coverage, "insured" is defined as:

> The following are "insureds"
> a. You for any covered "auto"
> b. anyone else while using with your permission a covered "auto" you own, hire or borrow except:
>> (1) The owner or anyone else from whom you hire or borrow a covered "auto". This exception does not apply if the covered "auto" is a "trailer" connected to a covered "auto."

---

[1]Appellant's Brief indicates the policy dates from April 15, 2000. According to Plaintiff-Appellee Haberman, however, the policy at issue here was first issued in 1994. Aplee. Br. at 5 (citing Aplee Supp. App. at 791). In considering the motion for summary judgment, the district court noted that the only complete, certified copy presented into evidence was date stamped March 26, 2002.

(2) Your "employee" if the covered auto is owned by that "employee" or a member of his or her household.

(3) Someone using a covered "auto" while he or she is working in a business of selling, servicing, repairing, parking or storing "autos" unless that business is yours.

(4) Anyone other than your "employees", partners (if you are a partnership), members (if you are a limited liability company), or a lessee or borrower or any of their "employees" while moving property to or from a covered "auto."

(5) A partner (if you are a partnership) or a member (if you are a limited liability company) for a covered "auto" owned by him or her or a member of his or her household.

c. Anyone liable for the conduct of an "insured" described above, but only to the extent of that liability.

Aplt. App. at 46.

In "Section V - Definitions," "insured" is defined as: any person or organization qualifying as an insured in the Who is An Insured provision of the applicable coverage." Aplt. App. at 53. In an endorsement entitled "Oklahoma Uninsured Motorists Coverage" (hereinafter: "UM/UIM endorsement") the "Who is an Insured" provision provides that an insured is:

1. You
2. If you are an individual, any "family member".
3. Anyone else "occupying" a covered "auto" or a temporary substitute for a covered "auto". The covered "auto" must be out of service because of its breakdown, repair, servicing, "loss," or destruction.
4. Anyone for damages he or she is entitled to recover because of "bodily injury" sustained by another "insured."

Aplt. App. at 58-59.

In an endorsement entitled "Auto Medical Payments Coverage," the "Who is Insured" provision states that an insured is:

- 4 -

1. You while "occupying" or, while a pedestrian, when struck by any "auto."
2. If you are an individual, any "family member" while "occupying or, while a pedestrian, when struck by any "auto".
3. Anyone else "occupying" a covered "auto" or a temporary substitute for a covered "auto". The covered "auto" must be out of service because of its breakdown, repair, servicing, loss or destruction.

Finally, there is an endorsement provision titled "Named Persons . . . As Insureds"

which states as follows:

This endorsement modifies insurance provided under the following: BUSINESS AUTO COVERAGE FORM, GARAGE COVERAGE FORM, TRUCKERS COVERAGE FORM . . .

Named Person(s) or Organizations(s): JOANN HABERMAN, AN INDIVIDUAL . . .

Each person or organization listed above is an "insured" for LIABILITY COVERAGE, but only to the extent that person or organization qualifies as an 'insured' under the WHO IS INSURED provision of SECTION II - LIABILITY COVERAGE.

Aplt. App. at 64; 365.[2]  This provision also listed Haberman as an "additional insured."

*Id*.

Section I "Covered Autos" under the Business Auto Coverage Form, states:

Item Two of the Declarations shows the "autos" that are covered "autos" for

---

[2]  Haberman asserts that at the time of issue the insurance agent explained to her that a Named Person as insured endorsement was added to the policy in recognition of the fact that Haberman would not otherwise have any personal automobile insurance coverage.  Aplee. Supp. App. at 791-95.  In a letter dated August 8, 1994, the agent explained that the endorsement "adds you as an individual named to the insurance policy since you do not have an individual personal automobile policy."  Aplee. Supp App. at 873; 793-94; 799-800.

each of your coverages. The following numerical symbols describe the "autos" that may be covered "autos." The symbols next to a coverage on the Declarations designate the only "autos" that are covered "autos."

Aplt. App. at 45. The symbol "7" is defined as:

Specifically described "Autos" - only those "autos" described in Item Three of the Declarations for which a premium charge is shown (and for Liability Coverage any "trailers" you don't own while attached to any power unit described in Item Three.

Aplt. App. at 45. The commercial policy section titled "Item Two - Schedule of Coverages and Covered Autos," uses the symbol "07" under Uninsured Motorists Coverages.

The UM provisions in the policy only covered two automobiles, a 1988 Honda Accord and a 1999 Lexus LS400, which were listed under Symbol 7 of the Center's commercial automobile policy. The commercial policy section titled "Schedule of Limits Uninsured Motorist Coverage and Underinsured Motorists Coverage" states that the limits are designated as $300,000 each "accident."

### B. Haberman's Claim to the Hartford

On February 28, 2001, Haberman, through counsel, submitted initial correspondence to the Hartford stating, "We are making a claim under Dr. Haberman's uninsured motorist coverage." Ann Marie Mull was the Hartford adjuster assigned to the claim.

On March 27, 2001, Mull wrote Haberman's attorney a letter explaining that the Hartford had denied coverage because only the two scheduled vehicles under the policy

(the 1988 Honda and the 1999 Lexus LS 400) were covered. Mull cited the definition of "Symbol 7" found in the Business Auto Coverage Form under the policy, as the basis for denial because Haberman was not riding in a covered vehicle under the commercial insurance policy. Mull also requested that Haberman provide any additional information that she wished the Hartford to consider on its decision to deny coverage.

## PROCEDURAL HISTORY

On July 30, 2001, Haberman filed suit against the Hartford, alleging claims under the insurance contract and for bad faith failure to pay. The United States District Court for the Western District of Oklahoma exercised jurisdiction pursuant to 28 U.S.C. § 1441 et seq. and 28 U.S.C. § 1332, as the parties are completely diverse and the amount in controversy exceeded $75,000.

On May 28, 2002, the Hartford filed a motion for summary judgment which addressed the contract and bad faith claims. Haberman filed an objection to the Hartford's motion for summary judgment and a counter motion for summary judgment on the coverage issue. Applying Oklahoma law, the district court concluded, as a matter of law, that the Named Person endorsement is unambiguous and makes Haberman a named insured for all purposes under the policy. The trial court also made an alternative ruling that if there is any merit to the Hartford's interpretation of the endorsement, it is ambiguous and any ambiguity would be resolved in favor of Haberman based on parol evidence which includes the interpretations of the Hartford's adjusters. Based on these

conclusions, the trial court entered summary judgment on the coverage issues in favor of Plaintiff Haberman.

The case proceeded to trial on August 11, 2003. At the conclusion of the evidence, Haberman moved for judgment as a matter of law on her contract claim. The motion was granted. The Hartford also made motions for judgment as a matter of law, but each time the grounds for the motion were limited to Haberman's bad faith cause of action. The motion as to the bad faith claim was denied.

The case then went to the jury. Haberman requested jury instructions which dealt with the specific duties of the Hartford, which the trial court declined to give. Haberman also objected to Instruction No. 11, Failure to Deal Fairly and in Good Faith, for not noting specific items of the Hartford's conduct which could be considered bad faith.

On August 15, 2003, the jury returned a Plaintiff's verdict for $548,000 on the contract claim, $5,000 for actual damages on the bad faith claim and a further $100,000 for punitive damages on the bad faith claim. Judgment was entered by the district court on September 3, 2003. On Sept. 17, 2003, Haberman filed a motion to alter the judgment or for a new trial, which was denied on November 13, 2003.

## ISSUES PRESENTED

On appeal, the Hartford alleges pretrial, trial and post-trial errors, and Haberman alleges a post-trial error by a cross-appeal. The Hartford contends that the court committed reversible errors by finding that the named person endorsement makes

Haberman a "named insured" for all purposes under the insurance policy, and by its

ruling that Haberman is entitled to stack UM benefits. We affirm the district court on

these rulings.[3]

The Hartford next raises two trial errors. First, the Hartford argues that the district

court erred in denying its motion for judgment as a matter of law and submitting the issue

of bad faith to the jury. Second, the Hartford argues that the court committed reversible

error by instructing the jury on punitive damages. We hold that the district court correctly

applied the law on these issues.

Finally, the Hartford contends that the amount of punitive damages violates its due

process rights. We disagree and hold that the punitive damages award is not violative of

due process.

On cross-appeal, Haberman argues that the trial court erred in failing to grant a new

trial based on inadequate instructions. We hold that the district court's instructions were

adequate.

## DISCUSSION

As an initial matter, we address whether the Hartford properly preserved for appeal

---

[3] In her answer to the Hartford's appeal, Haberman contends that the Hartford did not properly preserve the issues set forth in its propositions relating to the trial court's finding of coverage for Haberman as a named insured because the decision was made before trial on summary judgment and the Hartford consented to Haberman's motion for judgment as a matter of law on the contract claim at the close of all the evidence. As we shall discuss below, however, the Hartford was prejudiced by the trial court's summary judgment determination and may properly appeal these issues.

the issues relating to the district court's finding of coverage for Haberman as a named insured. Haberman contends that because the district court's finding of coverage was made before trial on summary judgment, and because the Hartford consented to Haberman's motion for judgment as a matter of law at the close of all the evidence, the Hartford may no longer appeal these issues. She points out that if the trial court grants a motion for directed verdict, an adverse party who did not object to the lack of supporting grounds in the trial court may not raise the point in the appellate court.[4]

Indeed, this court has held that the denial of summary judgment based on factual disputes is not properly reviewable on an appeal from a final judgment entered after trial. *Whalen v. Unit Rig, Inc.*, 974 F.2d 1248, 1250-51 (10th Cir.), *cert. denied*, 507 U.S. 973 (1992) ("even if summary judgment was erroneously denied, the proper redress would not

---

[4] In support of her argument that the Hartford has waived any errors in the district court's finding of coverage for her as a named insured, Haberman also points out that the Hartford's witnesses at trial expressed acquiescence in the pretrial determination of coverage and the Hartford voluntarily paid medical payments coverage pursuant to the court's coverage determination.

However, at trial, the Hartford was bound by the court's summary judgment order finding coverage for Haberman. Thus, the Hartford could only proceed on the basis that Haberman was a named insured at trial. In addition, the fact that an insurer pays a claim does not justify a blanket finding that coverage was not in dispute. It is possible that the insurer paid the claim in an effort to settle the case. *Robinson v. State Farm Mut. Auto. Ins.* Co., 45 P.3d 829 (Idaho 2002). Moreover, the Hartford points out that as a strategic matter the medical payment of $2,000 was *de minimis* when compared to the $600,000 at issue and that the Hartford wanted to offset the appearance of bad faith to a jury. *See* Appellant's/Cross Appellee Hartford's Reply Brief at 11. Therefore, we do not find the Hartford's conduct at trial or its payment of the medical coverage amount dispositive on the waiver question.

be through appeal of that denial but through subsequent motions for judgment as a matter of law. . . and appellate review of those motions if they were denied."). *See also Allahar v. Zahora*, 59 F.3d 693, 695-96 (7th Cir. 1995) (failure to renew a summary judgment argument – when denial was based on factual disputes – in a motion for judgment as a matter of law under Fed. R. Civ. P. 50(a)(1) at the close of all the evidence is considered a waiver of the issue on appeal). However, when the material facts are not in dispute and the denial of summary judgment is based on the interpretation of a purely legal question, such a decision is appealable after final judgment.[5] *Wilson v. Union Pacific R.R. Co.*, 56 F.3d 1226, 1229 (10th Cir. 1995); *Ruyle v. Continental Oil Co.*, 44 F.3d 837, 841-42 (10th Cir. 1994), *cert. denied*, 133 L. Ed. 2d 193, 116 S. Ct. 272 (1995). In the present case, the district court undertook a legal interpretation of the insurance contract when ruling on the motion for summary judgment. The court concluded that the contract covered Haberman under the uninsured motorist (UM) provision as a matter of law. By so concluding, the court took the coverage issue away from the jury, leaving it only the question of damages. The rulings below raise pure questions of law that are reviewable

---

[5] We have noted that because of this "critical distinction between summary judgment motions raising the sufficiency of the evidence to create a fact question for the jury and those raising a question of law that the court must decide," prudent counsel will not rely on their own interpretations whether an issue is purely a question of law or fact. *Wolfgang v. Mid-America Motorsports Inc.*, 111 F.3d 1515, 1521 (10th Cir. 1997). Accordingly, we have advised that out of an abundance of caution, and good trial practice, counsel should renew summary judgment grounds in a Rule 50 motion for judgment as a matter of law at the close of all the evidence, and again, if necessary, after the jury has returned a verdict and the trial has concluded. *Id.*

on appeal.

We review *de novo* a district court's disposition of a motion for judgment as a matter of law. *Baty v. Willamette Indus. Inc.*, 172 F.3d 1232, 1241 (10th Cir. 1999) (quotations and citations omitted), *overruled on other grounds, Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). In diversity cases, the substantive law of the forum state governs the analysis of the underlying claims, including specification of the applicable standards of proof, but federal law controls the ultimate, procedural question whether judgment as a matter of law is appropriate. *See Gust v. Jones*, 162 F.3d 587, 593, 596 (10th Cir. 1998). Therefore, the substantive law of Oklahoma applies and governs as we review the issues raised on appeal in this case.

**A. Effect of the "Named Person" Endorsement**

**1.**

The Hartford first contends that the district court erred by holding that Haberman is a "named insured" under its insurance contract with Breast Cancer Screening Center of Oklahoma, Inc. According to the Hartford, the "named person . . . as insured" endorsement which lists Haberman as a "named person" refers only to her liability coverage under the contract. [6] We are not persuaded.

---

[6] The Hartford also argues that the "named insured" under the insurance policy in question is exclusively the Breast Cancer Screening Center of Oklahoma, Inc., a corporation. According to the Hartford, the fact that Haberman was the sole shareholder in the corporation does not mean the insurance coverage extended to the corporation should extend beyond the corporate shell to Haberman. This argument, however, misses

The guidelines for ascribing meaning to an insurance policy's terms in Oklahoma are well established. An insurance policy is a contract; when its terms are unambiguous and clear, the language is accorded its ordinary, plain meaning and enforced so as to carry out the parties' intentions. *Bituminous Casualty Corp. v. Cowen Construction, Inc.*, 55 P.3d 1030, 1033 (Okla. 2002) (footnotes omitted). *See also IDG, Inc. v. Continental Casualty Co.*, 275 F.3d 916, 921 n.2 (10th Cir. 2001). The parties are bound by the terms of their agreement and the court will not undertake to rewrite the same nor to make for either party a better contract than the one which was executed. *Id.* "The test to be applied in determining whether a word [or phrase] is ambiguous is whether the word [or phrase] 'is susceptible to two interpretations' on its face." *Cranfill v. Aetna Life Insurance Co.*, 49 P.3d 703, 706 (Okla. 2002) (quoting *Littlefield v. State Farm Fire and Cas. Co.*, 857 P.2d 65, 69 (Okla. 1993)). The test "is applied from the standpoint of a reasonably prudent lay person, not from that of a lawyer." *Id.* (citing *Couch on Insurance* 3d § 21:14 (1995)). In reviewing a provision of an insurance contract, the court should not use "a forced or strained construction," take "a provision out of context," or "narrowly focus[] on a provision," *Wynn v. Avemco Ins. Co.*, 963 P.2d 572, 575 (Okla. 1998) (citing *Dobson v. St. Paul Ins. Co.*, 812 P.2d 372, 376 (Okla. 1991)), "so as to

---

the point. The issue is not whether a principal is entitled to coverage under the corporation's insurance, but whether the "named person . . . as insured" endorsement in the present case modifies the "Business Auto Coverage Form" to make Haberman a "named insured" for purposes of UM/UIM coverage.

import a [more] favorable consideration to either party than that expressed in the contract." *Crawford v. Indemnity Underwriters Ins. Co.*, 943 P.2d 1099, 1101 (Okla. Civ. App. 1997).

The parties agree that absent the named person endorsement, Haberman would not be entitled to UM/UIM benefits under the policy because she was neither a "named insured" on the policy's declarations page nor riding in a covered auto at the time of the accident. Thus, the issue to be resolved is the effect of the named person endorsement. Notably, the endorsement is titled "***NAMED PERSON(S)* OR ORGANIZATION(S) *AS INSURED*.**" (emphasis added). The endorsement states that the endorsement "changes the policy" and JoAnn Haberman is listed as a "named person." In addition, the document states that the endorsement "modifies insurance provided under the . . . BUSINESS AUTO COVERAGE FORM, GARAGE COVERAGE FORM and TRUCKERS COVERAGE FORM." The "Business Auto Coverage Form" includes liability coverage, uninsured and underinsured motorist (UM/UIM) coverage, and medical payments coverage. Clearly, based on this language alone, the endorsement unambiguously modifies the policy to make Haberman an "insured" for all purposes.

However, the last sentence in the endorsement states that each person named is "an 'insured' for LIABILITY COVERAGE, but only to the extent that person . . . qualifies as an 'insured' under the WHO IS AN INSURED provision of SECTION II - LIABILITY COVERAGE." The Hartford argues that this sentence means that Haberman is a "named

- 14 -

insured" only for liability coverage. But, the sentence does not expressly state that Haberman is covered only for liability, and the Hartford fails to articulate why an endorsement purportedly limiting a named insured only to liability coverage would clearly state that the endorsement modifies the whole policy – "Business Auto Coverage Form," "Garage Coverage Form," and "Truckers Coverage Form." By the plain words of the sentence, the named insured is provided liability coverage, but only to the extent provided for in the liability section of the policy. Read in its entirety, the endorsement makes Haberman a named insured for all purposes under the policy, but her liability coverage is limited to the extent provided for in the liability section of the policy.

Even assuming arguendo that there is merit to the Hartford's argument, the endorsement would be ambiguous because it does not explicitly exclude all other coverage and the ambiguity would be resolved in favor of Haberman. *Kerr-McGee Corporation v. Admiral Insurance Co.*, 905 P.2d 760, 762 (Okla. 1995) (if the language in an insurance contract is found to be ambiguous, the contract should be "interpreted consistent with the mutual intent of the parties, with the ambiguity resolved most favorably to the insured and against the insurance carrier"). *See also McDonald v. Schreiner*, 28 P.3d 574, 577, n. 11 (Okla. 2001) ("When an insurance contract provision is ambiguous, words of inclusion will be *liberally* construed *in favor* of the insured and those of exclusion will be *strictly* construed *against* the insurer.") (emphasis in original); *Max True Plastering Co. v. United States Fidelity and Guaranty Co.*, 912 P.2d 861 (Okla.

1996).  Because the endorsement does not expressly exclude all other coverage, or expressly limit coverage to liability only, we hold that Haberman is a named insured for all purposes under the policy, including UM/UIM coverage.[7]

**2.**

The Hartford next contends that under Oklahoma law, UM/UIM coverage may be tied to specified vehicles in a commercial auto insurance policy and that, as a result, Haberman is not entitled to UM/UIM coverage since she was not riding in a "covered" vehicle.  Haberman's expert witness conceded during her testimony that UM/UIM coverage may be tied to specified vehicles in a commercial auto insurance policy. Therefore, the issue is whether an individual who is a "named insured" may be limited to specified vehicles for purposes of UM/UIM coverage in a commercial auto insurance policy.

---

[7] The Hartford also contends that the trial court "erroneously ruled" that Haberman's policy is ambiguous, and that it erred in relying on parol evidence to find that Haberman is a named insured.   This argument, however, misapprehends the district court's Order.  First, the court found that the policy is not ambiguous and that the Named Person endorsement clearly made Haberman, individually, an additional named insured under all coverages of the auto policy.  The court then went on to make an alternative finding: if there is any merit to the Hartford's interpretation of the endorsement as adding Haberman to the policy for "liability only," then the policy would be ambiguous and any ambiguity would be resolved in favor of Haberman. *See* Order of March 20, 2003 at 10. This alternative finding is based on parol evidence which includes the interpretations of the Hartford's adjusters and the communications Haberman had with the agent who sold the policy.  Because we conclude that the district court correctly interpreted the endorsement, it is not necessary to discuss whether parol evidence could be introduced to ascertain the intentions of the parties.

As far as we are aware, there is no Oklahoma case precedent directly addressing this issue. Nevertheless, the Hartford asserts that the Oklahoma Supreme Court's ruling in *Graham v. Travelers Insurance Co.,* 61 P.3d 225 (Okla. 2002), supports its argument that Haberman may be denied UM coverage because she was not riding in a "covered" vehicle. Our review of *Graham*, however, shows that the case is distinguishable from the present case. The record in this case also clearly shows that the policy did not tie Haberman's UM/UIM coverage to specified vehicles so that we conclude that Haberman is entitled to UM coverage based on the policy.

In *Graham*, the Oklahoma State Supreme Court addressed whether in a commercial insurance policy, UM/UIM coverage that is provided for vehicles owned by the named insured, must also be provided to employees using their own vehicles, which are limited by an endorsement to liability coverage.[8] *Id*. at 226-27. The court began by

---

[8] Oklahoma's UM statute, 36 O.S. 2001 § 3636 states in pertinent part:

A. No policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance or use of a motor vehicle shall be issued, delivered, renewed, or extended in this state with respect to a motor vehicle registered or principally garaged in this state unless the policy includes the coverage described in subsection B of this section.

B. The policy referred to in subsection A of this section shall provide coverage therein or supplemental thereto for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles and hit-and-run motor vehicles because of bodily injury . . . ."

F. A named insured or applicant shall have the right to reject uninsured

examining the policy at issue in the case:

> The policy included in the record has separate explanations for "WHO IS AN INSURED" for the liability coverage, and for the UM coverage. The UM coverage is in the form of an endorsement, which states in bold letters at the top "THIS ENDORSEMENT CHANGES THE POLICY. READ IT CAREFULLY." In a larger font, the next line reads "OKLAHOMA UNINSURED MOTORISTS COVERAGE." Under section B, "WHO IS AN INSURED," the policy provides:
>
> 1. You.
>
> 2. If you are an individual, any "family member."
>
> 3. Anyone else "occupying" a covered "auto" or a temporary substitute for a covered "auto." The covered "auto" must be out of service because of its breakdown, repair, servicing, "loss" or destruction.
>
> 4. Anyone for damages he or she is entitled to recover because of "bodily injury" sustained by another "insured."
>
> . . . Under an endorsement entitled "Employees as Insureds" the policy provides, "The following is added to the 'LIABILITY COVERAGE WHO IS AN INSURED provision." On the next line it adds, "Any employee of yours is an 'insured' while using a covered 'auto' you don't own, hire or borrow in your business or your personal affairs." The Business Auto Coverage Part Declarations page shows a covered auto symbol of "1" for liability coverage. The limit of insurance is $ 1,000,000.00. Symbol "1" on the Business Auto Coverage Form indicates that "1 = ANY 'AUTO.'"

*Id*. at 228. Finding that the endorsements clearly show that CKE (the employer) and

---

motorist coverage in writing, and except that unless a named insured or applicant requests such coverage in writing, such coverage need not be provided in or supplemental to any renewal, reinstatement, substitute, amended or replacement policy where a named insured or applicant had rejected the coverage in connection with a policy previously issued to him by the same insurer.

Travelers (the insurance company) intended UM/UIM coverage for vehicles owned by CKE, the Oklahoma State Supreme Court held that "Graham's vehicle clearly was insured for liability and was not insured, under the provisions of the policy, for UM/UIM." *Id*. at 229.

The court pointed out that Graham, the plaintiff, was required by law to have liability coverage, and thus UM/UIM coverage, for his own vehicle:

> CKE's liability policy for nonowned vehicles benefits the company since it insures CKE for the negligent acts of its employees who are in the course of their employment. It has an indirect benefit to the employee, who must by law insure his own vehicle for liability.

*Id*., 61 P. 3d at 229 (internal citations omitted). As a result, the court concluded that not finding UM/UIM coverage in that case did not violate Oklahoma's public policy interest in providing UM/UIM coverage.

Here, Haberman is a named insured by virtue of the "named person" endorsement. The plain words of the endorsement made Haberman a named insured for all purposes, including UM/UIM coverage, since the endorsement modified the entire policy. The endorsement also did not limit Haberman's coverage to only liability for circumstances "in the course of employment," unlike the endorsement in *Graham* that was specifically limited to adding company employees to the company's liability coverage while acting in the course of their employment. In addition, the UM/UIM endorsement in this case did not expressly limit Haberman's UM/UIM coverage to only "covered" vehicles, unlike the policy in *Graham*. Accordingly, the policy in this case provided coverage to Haberman in

- 19 -

her capacity as an individual, rather than only as an employee of Breast Cancer Screening Center of Oklahoma, Inc.

Moreover, the record indicates that both Haberman and the Hartford intended for the policy to provide UM/UIM coverage to Haberman. The Hartford knew that Haberman is the sole principal of a closely held business. The Hartford knew that the vehicles that Haberman drives for her personal use were the same vehicles used by her closely held business, and that she did not have any separate automobile insurance. That is why the Hartford's insurance agent explained in a letter to Haberman: "The second endorsement [the "Named Person(s) or Organization(s) as Insured" endorsement] adds you as an Individually Named Insured to the automobile policy *since you do not have an individual Personal Automobile policy*."[9] Therefore, the policy in this case was designed to give a direct, rather than an "indirect," benefit to Haberman.

Oklahoma courts have stated that "[a]ny attempt to tie uninsured motorist coverage to automobiles alone, rather than to people, must fail." *State Farm Mutual Automobile Ins. Co. v. Wendt*, 708 P.2d 581, 585 (Okla. 1985) (citing *Cothren v. Emcasco Insurance Co.*, 555 P.2d 1037 (Okla. 1976)). *See also Mustain v. United States Fidelity & Guaranty Co.*, 925 P.2d 533, 535 (Okla. 1996) ("Pursuant to 36 O.S. 1991 § 3636, UM insurance is first-party coverage that follows the person.") (footnotes omitted). The policy in this case provided UM/UIM coverage to Haberman as an individual. Given that

---

[9] *See* letter from the insurance agent, C.L. Frates & Company, to Dr. Haberman dated August 8, 1994 (emphasis added). Aplee. Supp App. at 873; 793-94; 799-800.

- 20 -

the endorsement did not limit Haberman's coverage to liability or "in the course of employment," and given that the UM/UIM endorsement did not limit coverage to only while "riding in a covered vehicle," we conclude that Haberman is entitled to UM/UIM coverage, even though she was not riding in a "covered" vehicle, as she would have in a personal policy in which she is a named insured. *See Graham* at 230 (quoting *Moser v. Liberty Mutual Ins. Co.*, 731 P.2d 406, 408 (Okla. 1986) ("[T]he intent of the uninsured motorist legislation is to afford one insured under his own liability insurance policy the same protection in the event he is injured by an uninsured motorist as he would have had if the negligent motorist had carried liability insurance.")).

To be clear, our decision is based on the facts of this case: the record shows that the parties intended for Haberman to have UM/UIM coverage; and, as noted above, the policy did not limit Haberman's coverage to liability and the UM/UIM endorsement did not specifically limit coverage only to while riding in a covered vehicle. We are, therefore, confident that Oklahoma courts will not find our ruling today inimical to the state's public policy on UM/UIM coverage.

**3.**

The Hartford also contends that the district court committed reversible error because the court allowed Haberman to stack the UM benefits. We find no merit to this claim of error.

As discussed above, Haberman is a named insured in her capacity as an individual

rather than as an employee. Accordingly, she is a Class 1, rather than a Class 2, insured entitled to UM/UIM coverage. Under Oklahoma law, when separate premiums are charged for uninsured motorist coverage the benefits can be stacked. *See Withrow v. Pickard*, 905 P.2d 800, 803-804 (Okla. 1995) ("It is well settled in Oklahoma that insureds may stack their UM coverage for the additional vehicles under a policy if they have paid separate UM premiums for each vehicle."). The record in this case shows that two separate premiums of $128 each were paid for the two automobiles listed in the policy. Aplt. App. at 44. It was, therefore, not error for the district court to determine that Haberman could stack UM benefits.

## B. Bad Faith Claim

### 1.

The Hartford contends that the district court erred by denying its motion for judgment as a matter of law on the bad faith issue and submitting that issue to the jury. Because there is a legitimate dispute as to coverage, the Hartford argues, there cannot be bad faith. We are not persuaded.

This court reviews a district court's denial of a motion for judgment as a matter of law *de novo*, applying the same standard as the district court and construing the evidence in the light most favorable to the nonmoving party. *See Greene v. Safeway Stores, Inc.*, 98 F.3d 554, 557 (10th Cir. 1996). Unless the evidence so overwhelmingly favors "the movant as to permit no other rational conclusion, judgment as a matter of law is

improper." *Id*. (citation omitted). Under this standard, the evidence must be construed favorably against the Hartford, the moving party. Accordingly, we decide whether the evidence presented before the district court "so overwhelmingly" favors the Hartford as to permit no other rational conclusion.

Oklahoma courts have recognized an insured's right to sue his or her insurer for breach of the covenant of good faith and fair dealing. In *Christian v. American Home Assur. Co.*, 577 P.2d 899 (Okla. 1977), the Oklahoma Supreme Court stated: "We approve and adopt the rule that an insurer has an implied duty to deal fairly and act in good faith with its insured and that the violation of this duty gives rise to an action in tort for which consequential and, in a proper case, punitive, damages may be sought." The court in *McCorkle v. Great Atlantic Insurance Co.*, 637 P.2d 583, 587 (Okla. 1981), held:

> [T]he essence of the intentional tort of bad faith with regard to the insurance industry is the insurer's unreasonable, bad-faith conduct, including the unjustified withholding of payment due under a policy, and if there is conflicting evidence from which different inferences may be drawn regarding the insurer's conduct, then what is reasonable is always a question of fact to be determined by the trier of fact by a consideration of the circumstances in each case.

During the proceedings before the district court, Haberman presented evidence suggesting that the Hartford ignored the provisions of its own policy and ignored Oklahoma law. Haberman showed that the Hartford denied her claims for uninsured motorist and medical pay benefits. The Hartford delayed payment of Haberman's medical payments coverage until just weeks before trial. The Hartford did not evaluate

- 23 -

Haberman's claim until the third day of trial, and did not offer her any amount of money for her uninsured motorist claim. The Hartford did not check to see if Oklahoma law would permit tying the policy's uninsured motorist coverage for an individually named insured to specific vehicles. These facts, construed most favorably against the Hartford, can reasonably be perceived to be tortious.

These facts notwithstanding , the Hartford asserts that it demonstrated a legitimate dispute as to coverage under the policy, making it error for the district court to deny its motion for summary judgment.[10] In support of this argument, the Hartford cites *Narvaez v. State Farm Mutual Auto. Ins. Co.,* 989 P.2d 1051 (Okla Civ. App. 1999), wherein one of the divisions of the Oklahoma Court of Civil Appeals stated "[t]he general rule is that it is not bad faith for an insurer to resort to a judicial forum to settle legitimate disputes as to the validity or amount of an insurance claim. There can be disagreement between insurer and insured on a variety of matters such as insurable interest, extent of coverage, cause of loss, or breach of policy conditions." *Narvaez* at 1053.

However, this court has held that a "legitimate dispute as to coverage will not act as an impenetrable shield against a valid claim of bad faith" or unreasonable conduct. *Timberlake Constr. Co. v. U.S. Fidelity & Guar. Co.*, 71 F.3d 335, 343 (10th Cir. 1995) (applying Oklahoma law) (quoting *Oulds v. Principal Mut. Life Ins. Co.*, 6 F.3d 1431,

---

[10] Since the case has progressed to final judgment, the legal issue of the sufficiency of the evidence to present a question of fact may be argued before us.

1440 (10th Cir. 1993)). We stated in *Vining v. Enterprise Financial Group, Inc.*, 148 F.3d 1206, 1214 (10th Cir. 1998), that "a plaintiff may bring a bad faith cause of action even though a legitimate defense to a breach of contract claim exists if the defendant did not actually rely on that defense to deny payment under the policy." The record shows that the dispute identified by the Hartford in its motion for summary judgment (i.e., whether Plaintiff was an insured under the policy for purposes of UM/UIM coverage) was not the reason or justification the Hartford provided to Haberman for denying her request for UM/UIM benefits. The Hartford denied Haberman's claim on the ground that she was not riding in a "covered vehicle" at the time of the accident. Because the "legitimate" reason for denying Haberman's claim is different from the reason Haberman was given, we conclude that the district court correctly denied the Hartford's motion for summary judgment on the bad faith claim.

**2.**

The Hartford next contends that there was insufficient evidence to submit the punitive damages issue to the jury and that, as a result, the district court committed reversible error by instructing the jury on punitive damages.

In Oklahoma, punitive damages are allowable when there is evidence of reckless and wanton disregard of another's rights from which malice and evil intent may be inferred. *Graham v. Keuchel*, 847 P.2d 342, 363 (Okla. 1993) (citing *Mitchell v. Ford Motor Credit Co.*, 688 P.2d 42, 45 (Okla. 1984)). And "malice may be shown by 'an

indifference to or conscious disregard' of the rights of another, justifying an award of punitive damages." *Alsobrook v. National Travelers Life Ins. Co.*, 852 P.2d 768, 773 (Okla. Civ. App. 1992). In *State ex rel. Pollution Control Coordinating Board v. Kerr McGee Corp.*, 619 P.2d 858, 865-866 (Okla. 1980), the Oklahoma Supreme Court ruled that whether a defendant's conduct was sufficiently reckless to merit punishment by an award of punitive damages is a jury question. According to the court, where it is impossible to say from a reading of the record there was no evidence reasonably tending to support an inference of gross negligence, it is proper for the trial court to submit the punitive damage question to the jury. "Only when there is no evidence whatsoever that would give rise to an inference of malice or conduct deemed equivalent to malice may the trial court refuse to submit an exemplary damage instruction to the jury." *Id.*

Reading the record in this case, we cannot conclude that there is "no evidence whatsoever" that could give rise to an inference of malice. Haberman presented evidence suggesting that the Hartford ignored the provisions of its own policy and ignored Oklahoma law. Haberman argued that although the Hartford knew its insured suffered a serious injury and would have a substantial lost wages claim, the Hartford denied the claim. The Hartford delayed payment of Haberman's medical payments coverage until just weeks before trial. And Haberman asserted that the Hartford did not check to see if Oklahoma law would permit tying the policy's uninsured motorist coverage for an individually named insured to specific vehicles. These facts could give rise to an

inference of malice – that the Hartford was "indifferent" to, or "consciously disregarded," Haberman's rights. It was, therefore, proper for the district court to submit the issue to the jury.

### C. Due Process Claim

Finally, the Hartford contends that the punitive damages award of $100,000 is grossly excessive and violates its due process rights under the Supreme Court's holdings in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), and *State Farm Mutual Auto. v. Campbell*, 538 U.S. 408 (2003). We are not persuaded.

The Supreme Court instructs us to use three guideposts in reviewing whether a punitive damages award is grossly excessive: (1) the degree of reprehensibility of defendant's misconduct; (2) the disparity between the harm or potential harm suffered and the punitive damages award; and (3) the difference between the punitive damages award and the civil penalties authorized or imposed in comparable cases. *See BMW* at 574-575; *see also State Farm* at 418. In its brief to this court, the Hartford does not argue that the punitive damages award of $100,000 is grossly excessive on the basis of any of these three considerations. Instead, the Hartford argues that because the ratio between the compensatory award for the "bad faith"claim and the punitive damages is 20 to 1, the punitive damages award does not comport with due process.

Indeed, the Supreme Court stated in *State Farm* that few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree,

will satisfy due process. *State Farm* at 425. However, the Court also recognized that there are no rigid benchmarks that a punitive damages award may not surpass and that ratios greater than those previously upheld may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages. *Id.* at 425; *see also BMW* at 582 (Courts have consistently rejected the notion that the constitutional line determining excess in an award of punitive damages is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award. Indeed, low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of non-economic harm might have been difficult to determine.) .

We are not convinced that the low award of compensatory damages in this case cannot support the more than single digit ratio. In arriving at the punitive damages award, the jury considered the following evidence about the egregiousness of the Hartford's misconduct: the Hartford denied Haberman's claims for uninsured motorist and medical pay benefits; the Hartford delayed payment of Haberman's medical payments coverage until just weeks before trial; the Hartford did not evaluate Haberman's claim until the third day of trial and did not offer her any amount of money for her uninsured motorist claim; and the Hartford did not check to see if Oklahoma law would

permit tying the policy's uninsured motorist coverage for an individually named insured to specific vehicles. The Hartford has not argued that the injury in this case is not hard to detect, nor has it argued that the monetary value of non-economic harm involved is not difficult to determine.

The compensatory damages awarded by the jury were for non-economic harm and Haberman argued that the "non-economic value" of harm that she suffered was difficult to determine because she was fortunate enough to have had the financial means to pay her bills during the two years between the accident and trial. We, therefore, conclude that the punitive damages award in this case did not violate the Hartford's due process rights under the Constitution.

### D. Haberman's Cross-Appeal

On cross-appeal, Haberman contends that the district court erred by denying her motion for a new trial on the issue of the Hartford's bad faith, *i.e*, whether the Hartford's conduct was reckless, intentional or malicious. She argues that the court did not properly advise the jury as to the specific nature of the insurance company's duties under the circumstances of this case. More specifically, she asserts that even though the jury knew that she claimed certain duties were owed her by the Hartford, the jury was never fully instructed by the court as to what the law defines those duties to be. Because of this error, she claims, the jury did not have a sufficient basis to make a determination as to the degree of the Hartford's culpability.

"In a diversity case, the substance of a jury instruction is a matter of state law, but the grant or denial of a tendered instruction is governed by federal law." *Wolfgang v. Mid-America Motorsports, Inc.*, 111 F.3d 1515, 1525 (10th Cir. 1997). We review *de novo* the ultimate question of whether the jury was properly instructed on the question of law. *Id*. at 1526. In so doing, we "examine the instructions as a whole to determine if they sufficiently cover the issues in the case and focus on the facts presented by the evidence." *Id*. at 1526. *See also Wheeler v. Koch Gathering Systems, Inc.*, 131 F.3d 898, 903 (10th Cir. 1997); *Blanke v. Alexander*, 152 F.3d 1224, 1232 (10th Cir. 1998); *United States v. Lee*, 54 F.3d 1534, 1536 (10th Cir.), *cert. denied* 516 U.S. 895,116 S.Ct. 247,133 L.Ed.2d 173 (1995); *York v. AT&T*, 95 F.3d 948, 953 (10th Cir. 1996) ("we review de novo the question whether the court's instructions, considered as a whole, properly state the applicable law and focus the jury on the relevant inquiry.").

The district court's bad faith and punitive damage jury instructions were adopted from the instructions promulgated by the Oklahoma Supreme Court in the Oklahoma Uniform Jury Instructions. OUJI-Civ Nos. 22.1, 22.2, 22.3, and 22.4. Contrary to Haberman's assertion that the district court failed to inform the jury that the Hartford had a duty to "investigate and evaluate her claim and to 'assign a dollar value to the claim,'" the court's Jury Instruction No. 11 informed the jury that Haberman claimed the Hartford acted in bad faith for failing to properly investigate Haberman's claim, properly evaluate the results of the investigation, promptly evaluate and pay Haberman's claims and offered

her an unreasonably low amount to settle her claim.[11]  Aplt. App. at 458.  The "elements"

of bad faith in Instruction No. 11, practically incorporated every criticism that

Haberman's  bad faith expert, Susie Sullivan, made during trial concerning the handling

of the claim. The elements are as follows:

 1.     Defendant was required under the insurance policy to pay Plaintiffs
uninsured motorist and/or medical payment claim;
 2.     That Defendant's actions were unreasonable under the circumstances
because (a) it did not perform a proper investigation (b) it did not evaluate the
results of the investigation properly (c) it did not promptly evaluate and pay
her claims (d) the amount it offered to settle the claim was unreasonably low
(e) it unreasonably and erroneously interpreted Oklahoma law; or (f) it did not
properly train its employees and have a claims manual or written guidelines

---

[11]  Jury Instruction No. 11 read in pertinent part:

 Plaintiff has asserted that defendant failed to deal fairly and in good faith
in considering her insurance claim.  In this regard you are instructed that an
insurance company has a duty to deal fairly and to act in good faith with its
insureds and that a breach of this duty gives rise to an action for which
damages may be recoverable.
 To prove that a breach of this duty has occurred, plaintiff has the burden
of proving each of the following elements:

> (1)     that defendant was required under the insurance policy
> to pay plaintiff's uninsured motorist and/or medical
> payments claims;
> (2)     that defendant's actions were unreasonable under the
> circumstances because (a) it did not perform a proper
> investigation, (b) it did not evaluate the results of the
> investigation properly, (c) it did not promptly evaluate
> and pay her claims, (d) the amount it offered to settle
> the claim was unreasonably low, (e) it unreasonably and
> erroneously interpreted Oklahoma law; or (f) it did not
> properly train its employees and have a claims manual
> or written guidelines regarding Oklahoma law.

regarding Oklahoma law.

   3.     Defendant did not deal fairly and in good faith with Plaintiff; and

   4.     Defendant's violation of its good faith and fair dealing was a direct cause of the injuries sustained by Plaintiff.

Aplt. App. at 348-366, 458-463; Aplee. Supp. App. at 747-788. Thus, the jury had numerous guideposts in Instruction No. 11 by which to determine whether the Hartford's activity was reckless or malicious, and intentional.

The record also shows that the court modeled the jury instruction spelling out the acts of bad faith by the Hartford after the claim of bad faith asserted by Haberman in the parties' Second Amended Final Pretrial Report. Aplt. App. at 272-274. Moreover, Instruction No. 20 on punitive damages defined "reckless disregard" and "intentional malice." Aplt. App. at 464-466. The instruction gave sufficient descriptions so the jury could determine the damages. Accordingly, the district court's jury instructions contained the substance of the instructions requested by Haberman.

When the adequacy of a jury instruction is challenged, "we consider all the jury heard, and from the standpoint of the jury, decide not whether the charge was faultless in every particular, but whether the jury was misled in any way and whether it had understanding of the issues and its duties to determine these issues." *Mason v. Oklahoma Turnpike Authority*, 115 F.3d 1442,1454 (10th Cir. 1997). "While the instruction as a whole must convey the correct statement of the applicable law, no particular form is essential. We reverse an erroneous jury instruction only when we have substantial doubt whether the instructions, considered as a whole, properly guided the jury in its

- 32 -

deliberations." *Id.*

Considering the jury instructions in this case as a whole, we are convinced that the jury had sufficient basis to determine the culpability of the Hartford. Jury Instruction No. 11 on Good Faith and Instruction No. 20 on Punitive Damages together provided the jury an "intelligent, meaningful understanding of applicable issues and standards." *See United States v. Winchell*, 129 F.3d 1093,1096 (10th Cir. 1997) (quoting *United States v. Loughlin*, 26 F.3d 1523,1528 (10th Cir. 1994)). We, therefore, conclude that the district court properly denied Haberman's motion for a new trial.

Accordingly, we **AFFIRM** the district court's judgment.